# Attach. A

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
MIAMI DISTRICT OFFICE
HEARINGS UNIT

| | |
|---|---|
| Sylvia E. Farrington, | ) EEOC No.  510-2006-00218X |
| | ) Agency No. 05-00085 |
| Complainant, | ) |
| | ) |
| v. | ) |
| | ) |
| Michael Chertoff, Secretary, | ) |
| Department of Homeland Security, | ) |
| Federal Emergency Management Agency, | ) |
| | ) |
| Agency. | ) |
| | ) |

## ORDER ENTERING JUDGMENT

For the reasons set forth in the enclosed Decision, dated September 26, 2008, judgment in the above-captioned matter is hereby entered in favor of the Complainant.

The Decision was issued after a hearing and copies of the transcripts have already been provided to both parties' representatives so they could file their post-hearing briefs.  The originals and the mini-transcripts are enclosed for Barbara Montoya, Acting Chief Counsel for Litigation for the Federal Emergency Management Agency in Washington, D.C.

A copy of the Decision has been sent to the Complainant, Complainant's Representative, the Agency's Representative, Barbara Montoya for FEMA in Washington D.C., and the Department of Homeland Security's Office for Civil Rights and Civil Liberties in Washington, D.C.  In addition, a Notice to the parties explaining the appeal rights is attached to the Decision.

The report of investigation will be retained at this office for a period of sixty days, after which it will be discarded. Should the Agency wish to retrieve this file, it must make arrangements to do so

in that time by calling the undersigned Administrative Judge at the number listed below.

A copy of the Agency's Final Order should be sent to this office, to the attention of the Administrative Judge below.

It is SO ORDERED.


September 26, 2008

Eve G. Friedli                                    Date
Administrative Judge
U.S. Equal Employment Opportunity Commission
One Biscayne Tower, Suite 2700
2 South Biscayne Blvd.
Miami, FL  33131
(305) 808-1826

### CERTIFICATE OF SERVICE

For timeliness purposes, it shall be presumed that the parties received the foregoing ORDER ENTERING JUDGMENT and DECISION within five (5) calendar days after the date it was sent via first class mail.  I certify that on September 30, 2008, the foregoing ORDER ENTERING JUDGMENT and DECISION was sent via first class mail to the following:

Sylvia E. Farrington
P.O. Box 1463
Enka, North Carolina 28728

Ray S. Smith III, Esq.
MARSHALL & LUEDER, LLC
Five Concourse Parkway, Ste. 2600
Atlanta, GA 30328

Sabrina Dennis, Trial Attorney
Office of General Counsel
Federal Emergency Management Agency
500 C Street, S.W.  Suite 840
Washington, D.C.  20472

Barbara Montoya, Acting Chief Counsel for Litigation
Office of Chief Counsel, Room 840
Department of Homeland Security
Federal Emergency Management Agency
500 C. Street, S.W.
Washington, D.C.  20472

Department of Homeland Security
Office for Civil Rights and Civil Liberties
Room 3310
245 Murray Drive, N.W., Bldg. 410
Washington, D.C.  20528

Debra J. Cunningham
(305) 808-1820

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
MIAMI DISTRICT OFFICE
DECISION

In the matter of:                    EEOC No. 510-2006-00218X
                                     Agency Case No. 05-00085

Sylvia Farrington,

              Complainant,

     v.

Michael Chertoff, Secretary,
Department of Homeland Security,

              Agency.
_____/


| | |
|---|---|
| Complainant's Representative | Ray S. Smith, Esq.<br>Melinda A. Garlington, Esq. |
| Agency Representative | Sabrina Dennis, Esq.<br>Patrick Preston, Esq. |
| Nature of Complaint | Discrimination:<br>Race (African-American), Sex (Female), and Retaliation (prior EEO activity) |
| Administrative Judge | Eve G. Friedli<br>One Biscayne Tower<br>2 South Biscayne Boulevard<br>Suite 2700<br>Miami, Florida 33131 |
| Date of Decision | September 26, 2008 |
| Place of Hearing | Lake Mary, FL |

## I. FACTUAL AND PROCEDURAL BACKGROUND

Sylvia Farrington ("Complainant") worked as a Branch Chief in Orlando, Florida, for the United States Department of Homeland Security, Federal Emergency Management Agency ("Agency" or "FEMA"). She believes she has been discriminated against since June 2001 and continuing to the present. She made initial contact with an EEO counselor to discuss her allegations on July 7, 2005. See Report of Investigation ("ROI"), Exhibit B1, p. 1.

The Notice of Right to File a Discrimination Complaint was issued to the Complainant on September 27, 2005. Id. She filed a formal complaint, dated October 10, 2005, alleging that she was discriminated against on the basis of race, sex, and retaliation (EEO activity in informal meetings). ROI, Exhibit A1, pp. 1-7.

After further processing by the Agency, the Complainant requested a hearing on July 14, 2006. This hearing request was timely because it was within thirty days from when she received a copy of the ROI.

The case was assigned to an Administrative Judge. Pre-Hearing Conferences were held on January 17, 2007; February 22, 2007; and February 28, 2007. A hearing was held on May 15, 16, 17, 18 of 2007.

Jurisdiction is predicated on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e-16 ("Title VII"). The regulations authorizing these proceedings are found at 29 C.F.R. Section 1614.109.

2

## II. ISSUES

Whether the Complainant was discriminated against on the
basis of race (African-American), sex (female), and
retaliation (prior EEO activity) when: (1) she was allegedly
wrongfully subjected to an administrative investigation which
began in April of 2005, and culminated on May 27, 2005, when
she was abruptly released from the Joint Field Office in
Orlando, Florida, pending the outcome of an undefined and
unresolved administrative investigation, and said release
occurred with the additional embarrassment and degradation of
security guards positioned in the area; and (2) she was
allegedly subjected to an ongoing hostile work environment
since June 2001, to the present, during which time her
authority was undermined and misrepresented by other
Mitigation staff and management officials, and after the
release of the administrative investigation said investigation
was broadcast by employees and management officials.

## III. EXHIBITS

Reference may be made to the hearing transcripts
("H.T.") for a listing of exhibits.

## IV. LEGAL ANALYSIS AND FINDINGS OF FACT

The Complainant worked for FEMA since 1996 as a
Disaster Assistance Employee ("DAE"). Testimony of
Complainant, H.T., p. 229. She had a consistent work
history of being deployed over eight years with FEMA in
senior level management positions for catastrophic events.
ROI, Exhibit A1. She had also been the recipient of
numerous awards and bonuses. Id.; ROI, Exhibit (hereinafter

3

"Ex."), C4, p. 1.

The Complainant, an African-American female, alleged that the Agency discriminated against her on the basis of race (African-American), sex (female), and retaliation (prior EEO activity during informal meetings) when she was subjected to a hostile work environment since June 2001, by having her authority undermined and misrepresented, and by the Agency publically announcing to employees and managers that she had been under administrative investigation and released from her position. ROI, Ex. A1. The Complainant also alleged that the discriminatory manner in how she was released on May 27, 2005, further embarrassed and degraded her when the Agency placed armed security guards outside her work area to monitor her while she was packing her belongings.

The Agency denies discriminating against the Complainant or harassing her. The Agency contends she was not undermined and that the administrative investigation was necessary due to employee complaints made against her. It explained that her release was justified due to her deficiencies as a supervisor.

### Administrative Investigation and Release with Armed Security Guards Being Positioned in the Area

Todd Davison was one of the Complainant's higher level supervisors. He was the Mitigation Region Director for Region 4. Davison, H.T., p. 77. The Complainant was a member of his Cadre[1]. Davison, H.T., p. 81. Davison described her as a valued employee who had extremely high

---

1 A Cadre is a grouping of employees.  Davison, H.T., p. 79.

4

standards. Davison, H.T., pp. 108, 142.

Clay Saucier, one of the Complainant's previous supervisors, testified that the Complainant was very professional, enthusiastic, and hard working. Saucier, H.T., pp. 734-735.

From August 16, 2004, until May 27, 2005, the Complainant was deployed to the Orlando Joint Field Office[2] ("JFO") in Florida, where she served as a Branch Chief of Community Education and Outreach. Her duties and responsibilities included managing mitigation, planning, and responding to catastrophic events. She had responsibility for deployment of 400-500 employees. She served as Branch Chief until she was released from her position on May 27, 2005, shortly after an administrative investigation was concluded. ROI, Ex. C-4, p. 1.

## Prima Facie Retaliation Case

It is the burden of a Complainant to establish a prima facie case by either direct or circumstantial evidence. See Lee v. Russell County Board of Education, 684 F.2d 769, 774 (11th Cir. 1982); Zaklama v. Mt. Sinai Medical Center, 842 F.2d 291 (11th Cir. 1988). No direct evidence has been presented in this case; however, if direct evidence is not presented then a Complainant may still establish a prima facie case of discrimination through circumstantial evidence. McDonnell Douglas Corp.

---

2 During May 2005 the JFO changed into a Long Term Recovery Office. This allowed services to be rendered for a longer period of time, which resulted in some DAE employees becoming full time employees with a contract for work lasting anywhere

v. Green, 411 U.S. 792, 802 (1973); see also, Furnco Construction Corp. v. Waters, 438 U.S. 567, 576 (1978).

A Complainant may establish a prima facie case of retaliation by showing that that:

1) she engaged in a protected activity;
2) the responsible Agency official knew of that activity;
3) she was subjected to adverse treatment by the Agency; and
4) the adverse treatment followed the protected activity close enough in time and in such a manner so that there can be an inference of a nexus between the protected activity and the motivation for the action.

See, Payne v. New York Power Authority, 997 F. Supp. 492, 500 (S.D. N.Y. 1998); Brown v. ASD Computing Center, 519 F. Supp. 1096, 1114-15 (S.D. Ohio 1981); Cummings v. Air Force, EEOC Appeal No. 01972343 (December 15, 1998); Kelly v. VA, EEOC Appeal No. 01956660 (January 23, 1998); Jackson v. USPS, EEOC Appeal No. 01945098 (May 29, 1996); Wienecke v. HHS, SSA, EEOC Appeal No. 01941659 (May 2, 1995); Wilson v. Treasury, EEOC Appeal No. 01934411 (May 25, 1994).

The Complainant testified that in January 2005 she had a conversation with her immediate supervisor, Janet Lamb[3], about the Complainant's concerns about Lamb's

---

[3] Janet Lamb was the Deputy to the Mitigation Branch Manager for the JFO from August 16, 2004, through January 22, 2005. Commission Ex. 4; ROI, Ex. F3, p. 2. When she left Clay Saucier replaced her and served in the position from January 2005 through mid-April 2005. Saucier, H.T., pp. 704-709. During this timeframe, the Complainant reported to Saucier. Saucier, H.T., p. 709. After Clay Saucier left in mid-April 2005, Janet Lamb returned as the Deputy to the Mitigation Branch Manager in Orlando, Florida, from April 18, 2005, until August 2005. Commission Ex. 4; Lamb, HT, pp. 862, 935.

negative actions towards non-white staff, including herself. ROI, F-1, p. 17. Complainant told Lamb that she believed in the past Lamb had used the word "darkie" and that if she continued to undermine her authority in the workplace that she would file an EEO complaint against her. Complainant, H.T., pp. 309-310, 407; ROI, A-1, p. 6.

Janet Lamb denies the Complainant threatened to file an EEO complaint. Lamb, H.T., p. 932. However, Lamb acknowledged during the above conversation the Complainant told her about Complainant's belief that she [Lamb] had allegedly used the word darkie in 2001, and about her alleged undermining conduct towards the Complainant. Lamb, H.T., p. 895; ROI, Ex. F3, p. 5. Lamb denied ever using this word and asked the Complainant if she thought she had used it why did she wait so long to clear the air. Lamb testified that she was "very upset" over the allegations about having used the word darkie. Lamb, H.T., p. 895.

Shortly after the above conversation, the Complainant was subjected to an administrative investigation, released from her Branch Chief position, and her termination recommended against any future employment with FEMA. ROI, Ex. F-17; Commission Ex. 4.

The evidence shows that during the timeframe when Janet Lamb had been replaced in Orlando, Florida, by Clay Saucier and Lamb was no longer the Complainant's supervisor, Lamb instructed Wayne Box, a Special Assistant to the Mitigation Director, to document complaints made against the Complainant to provide to Saucier. Lamb, H.T.,

pp. 862-863; 953; ROI, F3, p. 5. By April 2005, Wayne Box had also been networking with Cindy Bourgeois, Deputy Admin. Section Chief, regarding personnel issues that had been described as "escalating." Commission Ex. 4 (Memorandum for the Record, dated April 13, 2005). Sandra Flowers, one of the Complainant's employees, e-mailed Cindy Bourgeois about her dissatisfaction with the Complainant on April 13, 2005. ROI, Commission Ex. 4.

Soon thereafter, on April 18, 2005, Janet Lamb returned to Orlando and replaced Clay Saucier. Lamb once again served as the Deputy to the Mitigation Branch Manager and as such, she resumed being the Complainant's supervisor. Within her first week back, Lamb continued providing instruction to have the Complainant documented, this time telling Sandra Flowers on April 22, 2005, to put her concerns about the Complainant in writing. Lamb, H.T., p. 951; ROI, Tab F3, p. 5. On April 23, 2005, Luletha Cheatham, a new DAE employee, also placed her concerns in an e-mail which she sent to Cindy Bourgeois. Commission Ex. 4.

I find that soon after Janet Lamb had instructed Wayne Box to document complaints about the Complainant that two written complaints surfaced and the Agency began an "administrative investigation." Commission Ex. 4. As a result, the Complainant was further scrutinized by Kathy Johnston, a Human Resources Specialist, who conducted the investigation. She interviewed Wayne Box, Janet Lamb, Todd Davison, Clay Saucier, and approximately ten of the Complainant's employees. Commission Ex. 4. The administrative investigation was completed by May 24,

2005, and the Complainant was released from her position as a Branch Chief by May 27, 2005. Commission Ex. 4. The evidence also showed that when she was released that armed guards were placed outside her work area for surveillance purposes until she left with her belongings. ROI, C4, p. 2. As will be discussed in detail later in this Decision, the release, in turn, resulted in the Complainant receiving lesser pay and adversely impacting her job opportunities.

Based upon the above, the Complainant meets all four elements of establishing a prima facie case of retaliation. I find that she engaged in protected activity when she had a discussion with Janet Lamb about how she treats non-whites and the Complainant's belief that Lamb had used the word the darkie. She told Lamb she thought Lamb was undermining her. I find that the Complainant also told Lamb if she did not change her conduct then she would file an EEO complaint. Even if the Complainant had not raised the possibility of filing an EEO complaint, her conversation still constituted protected activity because she was raising concerns with Lamb over how Lamb treated non-whites and whether she used the word darkie. Lamb was aware of this activity because she was present during the conversation.

The Complainant was subjected to adverse treatment by the Agency when it released her from her position for cause, thereby terminating her Orlando assignment prematurely. The release occurred on May 27, 2005, which followed her January 2005 conversation with Lamb close enough in time and in such a manner so that there can be

9

an inference of a nexus between the protected activity and the motivation for the action.

## Prima Facie Disparate Treatment Case on the Bases of Gender and Race

The Complainant may establish a circumstantial prima facie case of disparate treatment based on race (African-American) and sex (female) by proving by a preponderance of the evidence that she is a member of a protected class and she was treated differently than a similarly situated individual outside of her protected class. See e.g., Ramsey v. American Air Filter Co., 772 F.2d 1303, 1307 (7th Cir. 1985); Potter v. Goodwill Indus. of Cleveland, 518 F.2d 864, 865 (6th Cir. 1975); Scorcia v. USPS, EEOC Appeal 03980074 (Feb. 22, 1999); Freeman v. Labor, EEOC Appeal No. 01921738 (Oct. 26, 1992); Owens v. Army, EEOC Appeal No. 01911871 (Sept. 23, 1991).

In order for a comparative employee to be considered similarly situated, all relevant aspects of the Complainant's employment situation must be nearly identical to those of any comparative employees. See O'Neal v. USPS, EEOC Appeal No. 05910490 (July 23, 1991).

Factors that are considered to determine if comparators are similarly situated include: (1) whether the comparators reported to the same supervisor; (2) whether they performed the same job functions; (3) whether they were on the same tour; (4) whether they were disciplined during the same time period; and (5) whether they were subjected to the same standards governing discipline and engaged in conduct similar to the Complainant's without distinguishing or mitigating

10

circumstances. O'Neal v. USPS, supra, citing, Allen v. Department of the Navy, EEOC Request No. 05900539 (June 15, 1990); Guerrero v. USPS, EEOC Appeal No.01931635 (December 21, 1993); Kalivretenos v. USPS, EEOC Request No. 05890884 (October 13, 1989); Prichard v. USPS, EEOC Request No.05880261 (July 19, 1988); Jackson v. Department of the Navy, EEOC Request No.05880091 (June 22, 1988); Wright v. USPS, EEOC Request No. 05870622 (May 6, 1988).

The Complainant contends that Shabbar Saiffee was similarly situated to her, but treated more favorably than her even though he had engaged in behavior much worse than anything she was alleged to have done. Shabbar Saiffee, an East Indian (Complainant, H.T., p. 346; ROI, Ex. F1, p. 16), served as the technical service Branch Chief in the Mitigation Division in Orlando, Florida, and he reported directly to Janet Lamb. Complainant, H.T., pp. 392, 396; Lamb H.T., p. 900. The Complainant testified that Lamb told her two sexual harassment complaints were lodged against Saiffee during the timeframe of December of 2004, to January 2005, and that she [Lamb] and Todd Davison informally "counseled" him. Complainant, H.T., pp. 391, 445-446; ROI, Ex. F1, p. 17.

Clay Saucier testified that there was a sexual harassment complaint made against Shabbar Saiffee and that he participated in the meeting with an EEO investigator. Saucier, H.T., pp. 723-724.

The Complainant explained that women were intimidated by Shabbar Saiffee's behavior because he made sexual references and released females who did not flirt with him. Complainant, H.T., pp. 447-448, 451. The references

11

were made enough that staff commented that Saiffee was a "breast man." Complainant, pp. 454-455.

Janet Lamb testified that Madeleine Williams initially complained to her about what she considered to be unfair treatment by Shabbar Saiffee, which did not involve sexual harassment. Lamb testified she told Williams to go back to Saiffee to try to resolve things. Lamb, H.T., pages 900-901. The evidence shows that Williams was not satisfied with this response and subsequently went to the Equal Rights Office. Lamb was made aware that Williams complained to an EEO Officer about Saiffee sexually harassing her. Lamb, H.T., pp. 901-902. Lamb testified that she then learned that Williams alleged that Saiffee stared at her chest whenever he talked to her. Lamb, H.T., p. 902. I do not find Lamb's testimony credible that when Williams went to her to share concerns she had about Saiffee that she did not mention all of her concerns.

Subsequently, another female lodged a verbal complaint against Shabbar Saiffee for sexual harassment. Janet Lamb testified this lady told her that she feared Saiffee would not give her proper credit for the work she was doing. Lamb referred her back to Saiffee to see if they could resolve things amongst themselves before she would become involved. Lamb, pp. 903, 1011, 1014.

The evidence shows that Janet Lamb, Todd Davison, and an Equal Rights Official had a meeting with Shabbar Saiffee and Madeleine Williams regarding sexual harassment allegations made against him. Shabbar Saiffee was allowed to respond to the allegations before a decision was made

12

on how to deal with the situation. Lamb testified that
Madeleine Williams was "very uncomfortable with him
looking at her chest when he was talking to her." Lamb,
pp. 1009-1010. Although Saiffee initially denied looking
at Williams' chest, later during the above conversation he
said he "would not do it again." Lamb, H.T., p. 902. Lamb
opined that it had occurred because of Saiffee's "ethnic
background." Lamb, H.T., p. 1009. She testified that
mostly Davison "counseled" Saiffee by telling him that we
would not tolerate that kind of activity. Lamb, H.T., pp.
901-902. Lamb was the other manager present during the
meeting and she was in Saiffee's chain-of-command. As
such, I find she was part of this informal counseling
process. Williams' desk was then moved away from Saiffee's
line of sight and she was assigned to a new direct line
supervisor and Saiffee became her second line supervisor.
Lamb, H.T., pp. 902, 1015-1017.  Lamb concluded that the
above resulted in a successful resolution because Williams
had no more complaints.  However, the evidence of record
showed that Williams was let go two to three weeks later
for lack of work.  Lamb, H.T., p. 902.

In contrast, the Complainant was not provided with
the same opportunity to defend herself.  The investigation
pertained to her "possible abuse of position and
inappropriate behavior." ROI, Ex. F17, pp. 1-24.  The
investigation focused on her management style, such as,
whether she micromanaged people, led by fear, gave
misleading directions, engaged in character assassination
and/or preferential treatment. ROI, p. 1.  The evidence
showed that the accusations made against her were not

13

fully explained to her, which placed her in the position of being unable to fully respond to the allegations. Although the investigator interviewed the Complainant and drafted a statement for her to sign, the Complainant felt that the drafted statement was not an accurate representation of what she had said during her interview. Nevertheless, the investigator submitted it under the Complainant's name with her Administrative Investigation (hereinafter "Report") before the Complainant could clarify or submit her own written statement. The Complainant was then released for cause in the presence of armed guards. After her release, Janet Lamb held meetings to announce to staff members and managers that the Complainant had been under investigation and was released. ROI, Ex. F2, p. 159; Lamb, H.T., p. 963.

Janet Lamb also memorialized on the Complainant's most recent performance appraisal that she "was released from this disaster pending the outcome of an administrative investigation." ROI, F2, p. 75. Despite having written these words, Lamb contended in her EEO Affidavit that the Complainant received a satisfactory performance appraisal upon her release. ROI, F3, p. 6.

Based upon the above, the allegations of sexual harassment were, at a minimum, as serious as the allegations made against the Complainant pertaining to her management style and alleged preferential treatment. I reject the Agency's argument that Shabbar Saiffee does not fit the legal criteria to be a similarly situated individual to the Complainant. I find that Saiffee had the same supervisor (Janet Lamb) as the Complainant during the

same relevant timeframe, was performing as a Branch Chief like the Complainant, and engaged in conduct similar to the Complainant's alleged conduct without distinguishing or mitigating circumstances.

Based upon the above and as will be discussed in more detail below, I find that the Complainant has established that Shabbar Saiffee was similarly situated to her. I further find that she established a circumstantial prima facie case of disparate treatment based on race (African-American) and sex (female).

Pretext

The establishment of a prima facie case is not the equivalent of a finding of discrimination. It is simply proof of actions taken by the employer from which discriminatory animus may be inferred because experience has proven that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations. Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978). Thus, the burden would shift to the Agency to produce admissible evidence that its actions were taken for a legitimate, non-discriminatory reason. See Reeves v. Sanderson Plumbing Prods., Inc., 120 Sect. 2097, 2106 (2000); St. Mary's Honor Center v. Hicks, 509 US 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253-254 (1981); McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973). This burden is one of production, not persuasion, and it can involve no

credibility assessment.   See Reeves, 120 S.Ct. at 2106;
St. Mary's Honor Center, 509 U.S. at 509.

A complainant may then show that the reason
articulated by an agency is a mere pretext for
discrimination or unworthy of belief. See Reeves, 120
S.Ct. at 2106; St. Mary's Honor Center v. Hicks, 509 U.S.
at 507-508 (1993); Burdine, 450 U.S. at 256; McDonnell
Douglas, 411 U.S. at 804. The ultimate burden of
persuading the trier of fact that the Agency discriminated
against a complainant remains at all times with the
complainant. See Reeves, 120 S.Ct. at 2106; St. Mary's
Honor Center v. Hicks, 509 U.S. at 507.

The Agency articulated that it had a legitimate, non-
discriminatory reason for investigating the Complainant
and releasing her from her position. It explained that the
Complainant's performance as a manager was deficient, did
not meet the Agency's expectations, and resulted in two
employees filing formal complaints against her. The Agency
further articulated that the investigation led to the
Complainant's release. The Agency contended that Janet
Lamb was not involved with initiating the investigation or
with the Complainant's ultimate release. It contended that
Saiffee Saiffee was not a proper comparator for the
Complainant and as such, the Complainant could not show
that her treatment was due to any of her protected
categories[4].

The Complainant presented credible evidence she was

---

4 Although this contention has been addressed earlier in this Decision's section
pertaining to Prima Facie Disparate Treatment Case on the Bases of Gender and
Race, it will be further addressed in this section pertaining to Pretext.
Information on this topic in each section hereby incorporates the information
from the other section.

16

treated less favorably than Shabbar Saiffee and that if it were not for this differential in treatment she would not have been investigated in the first place. I find that Janet Lamb was responsible for ensuring that complaints about the Complainant be reduced to writing. Although Lamb was not the Complainant's supervisor at the time, she instructed Wayne Box to document complaints made against the Complainant and provide them to the Complainant's supervisor. Lamb, H.T., pp. 862-863; 953; ROI, F3, p. 5, Wayne Box followed her instructions and by April 2005, he had been networking with Cindy Bourgeois, informing her of personnel issues that were described as "escalating." Commission Ex. 4 (Memorandum for the Record, dated April 13, 2005). Sandra Flowers, one of the Complainant's employees, also communicated with Bourgeois regarding her dissatisfaction with the Complainant. ROI, Commission Ex. 4. When Lamb returned on April 18, 2005, she resumed being the Complainant's supervisor and within her first week back on April 22, 2005, Lamb instructed Sandra Flowers to put her concerns about the Complainant in writing. Lamb, H.T., p. 951; ROI, Tab F-3, p. 5.

There was no credible evidence that Sandra Flowers or Luletha Cheatham had first approached the Complainant with their concerns. Cindy Bourgeois and Kathy Johnston informed Clay Saucier, who was the Complainant's supervisor at that time, about the complaints pertaining to the Complainant's management style and said they wanted to look into it. Saucier, H.T., pp. 711-712.

Clay Saucier was aware that many of the Complainant's staff were relatively new employees, which could impact

17

upon a manager's management "style." ROI, Ex. F11, p. 7. The evidence indicated that Saucier disagreed with the agenda of Bourgeois and Johnston to look into matters because he felt that the Complainant should first be brought into the discussion and given an opportunity to address the employees' concerns. Saucier, H.T., pp. 712-713.

Clay Saucier decided to deal with the situation by having an informal counseling session with the Complainant regarding her management style and the need for clear directives. Saucier, H.T., p. 713. He found the Complainant to be receptive to his discussion with her about how she could better work with her staff. I find that the Complainant was taking steps to address staff concerns. Saucier testified that she held meetings to provide her staff with a forum for discussing their issues so they could be resolved. Saucier, H.T., pp. 714-715; ROI, Ex. F11, p. 4.

The Complainant had set up a process where people could raise a concern anonymously and have it addressed. Saucier, H.T., p. 715. While the Complainant invited Saucier, Bourgeois, and Johnston to attend, only Saucier took the opportunity to do so. Complainant, H.T., pp. 673-674; ROI, F11, p. 4. At least one staff member did not want to participate out of fear of how the Complainant might react. Saucier, H.T., p. 717.

Before the Complainant could fully pursue addressing staff concerns, Kathy Johnston informed her that she was being investigated for misuse of supervisory authority. Complainant, H.T., p. 685. The subsequent Report indicated

that the investigation was initiated because of the complaint received from Sandra Flowers, dated April 13, 2005, and a complaint from Luletha Cheatham received on April 23, 2005. Johnston explained that the investigation "targeted [Complainant's] supervisory skills." ROI, Ex. F4, p 6. An attached Memorandum, however, showed that Wayne Box had been networking with Cindy Bourgeois since at least April 13, 2005, to discuss escalating personnel issues. Commission Ex. 4 (Memorandum for the Record, dated April 13, 2005).

I find that even although the Complainant had begun the process to address these concerns and her supervisor, Clay Saucier, thought she was doing a good job of addressing the employees' issues, that the administrative investigation derailed this process. By April 2005, Johnston had begun conducting interviews, which would ultimately include approximately ten of the Complainant's employees. Commission Ex. 4. Approximately one month later, on May 24, 2005, Johnston completed the administrative investigation and the Complainant was released from her position as a Branch Chief by May 27, 2005. Commission Ex. 4.

Although FEMA also had an Alternate Dispute Resolution (ADR) program available for employees to use as an option for resolving disputes, it was not utilized. ROI, Ex. A1; ROI, F2, p. 180.

The Agency contends that Shabbar Saiffee was treated differently because no formal complaints were filed against him. I reject this contention. First, the Complainant testified that Janet Lamb told her that two

19

sexual harassment complaints were lodged against Shabbar
Saiffee. Complainant, H.T., pp. 391, 445-446; ROI, Ex. F1,
p. 17. Assuming arguendo that the complaints against
Shabbar Saiffee were not made in writing, this does not
explain the difference in treatment because it was Janet
Lamb that ensured complaints against the Complainant be
documented and placed in writing when she instructed Wayne
Box and Sandra Flowers to do so. I find that Lamb
instructed Box to engage in this activity after the
Complainant had already voiced her concerns to Lamb about
her belief that Lamb treated non-white staff differently,
had used the word darkie, was undermining her authority,
and that if things did not change she {Complainant] would
file an EEO complaint against her.

I further find Janet Lamb's instructions to Wayne Box
occurred before the administrative investigation began
when Lamb was not his supervisor and that he had been
networking with Cindy Bourgeois about personnel issues
that were supposedly "escalating." Commission Ex. 4
(Memorandum for the Record, dated April 13, 2005). Given
Lamb's instructions and Box's activities, it is not
surprising that by April 2005, two of Complainant's staff
members placed their complaints in writing. In contrast,
when employees came to Lamb with concerns about Shabbar
Saiffee, Lamb referred the employees back to Saiffee.

Cindy Bourgeois stated in her EEO affidavit that Janet
Lamb requested her assistance in addressing the concerns of
the Complainant's employees. ROI, Ex. F5, p. 3. Even
though there was no evidence at this time that either of
the two complaints against the Complainant raised any

20

discrimination concerns, Janet Lamb suggested that an EEO officer become involved. Lamb, H.T., pp. 863-864; ROI, Ex. F3, p. 7.

I find that even before the administrative investigation began, it was a foregone conclusion what the results should be. This is evident by a statement in Janet Lamb's EEO affidavit. Lamb stated that Cindy Bourgeois[5] and Kathy Johnston[6] advised her that "an administrative investigation was warranted based on documented incidents of a hostile work environment that her staff was subjected to." ROI, Ex. F3, p. 7, question and answer 21. At the time this statement was made, however, the complaints received were from Sandra Flowers and Luletha Cheatham and their complaints instead focused on the Complainant's managerial style. Although Cheatham mentioned that the Complainant discriminated, a review of her actual complaint discloses that she had been told by Cindy Bourgeois that to hold one group of employees to a different standard from another group was discrimination, but Bourgeois did not explain to Cheatham that the differential treatment had to be based upon a protected category. Commission Ex. 4. Without an understanding about "protected categories," Cheatham then claimed that Complainant was discriminating against her "leads" (an unprotected category) by requiring them to work on Saturdays to supervise their staff. Bourgeois used this information to claim there was a hostile work environment. This was disingenuous.

---

5 Janet Lamb identified her by the title of her position.
6 See footnote 5.

21

Case 1:13-cv-01582-RDM   Document 16-1   Filed 04/12/14   Page 26 of 73

Based upon the above, I find that Janet Lamb had a significant involvement in ensuring that the Complainant be investigated in some manner. Although Libby Turner, the Deputy Coordinator, testified that Lamb was reluctant for the investigation to go forward[7], I do not find this testimony credible.  Turner, H.T., p. 776. This would be contrary to the other actions that Lamb had already taken. Lamb put things in place to ensure that any complaints be placed in writing against the Complainant, as opposed to first encouraging the employee to provide their supervisor with an opportunity to resolve their concerns, like she did with Shabbar Saiffee. Lamb then recommended an EEO Officer become involved with the Complainant's situation.

In addition, when Libby Turner testified she stated that Cindy Bourgeois, Kathy Johnston, and Janet Lamb had informed her that two employees had complained. Turner testified that because she was relatively new at FEMA  she asked them what was the normal procedure to follow, at which time "they" said an administrative investigation. Turner, H.T., p. 774.

However, the record discloses that administrative investigations were not the normal procedure. Todd Davison had been with FEMA since 1996 and he had never heard of anyone being subjected to an administrative investigation until it happened to the Complainant.  ROI, Ex. F7, p. 7. Ernest Hunter also had not been aware of anyone being investigated in this manner. ROI, Ex. F8, p. 7. Clay

---

[7] Janet Lamb allegedly displayed her reluctance in the meeting with Kathy Johnson, Cindy Bourgeois, Libby Turner, and senior managers Ginger Edwards and John Crowley where discussions were held over whether to conduct an investigation. ROI, Ex. F3, p.3.

Saucier was similarly unaware. Saucier, H.T., p. 726.
Turner had not been aware of any policy pertaining to
administrative investigations. Turner, H.T., p. 792.
Neither had the Complainant and when she contacted Pauline
Campbell to try to learn more, she was told that
administrative investigations are for situations like when
an employee may have committed fraud. Complainant, H.T.,
page 314. Although John Crowley testified that he had
heard of administrative investigations, his information
source was Kathy Johnston. Crowley, H.T., pp. 827, 836.
The undersigned Administrative Judge ordered the Agency to
produce any regulation or policy it had pertaining to
administrative investigations, but the Agency represented
that no such documentation existed. H.T., pp. 751, 762-
764.

Janet Lamb was interviewed as part of the
investigation and the information she provided included
informing the investigator that she had heard from Clay
Saucier on April 18, 2005, that Sandra Flowers had
complaints. She also said Flowers had also told her that
she had never been subjected to such poor treatment
before. Commission Ex. 4 (Statement of Janet Lamb,
paragraph 6).

Janet Lamb attended a ten minute meeting with John
Crowley, Libby Turner, and Gracia Szczech when the
decision was made to release the Complainant. ROI, Ex. F3,
p. 3; Complainant H.T., p. 997. Lamb testified that when
this meeting was held she was aware that the Complainant
had not been provided with an opportunity to rebut the
Report. ROI, Ex. F3, p. 9. Lamb testified that she was not

23

involved with or a decision-maker for the Complainant's release. H.T., pp. 869-870, 939-940. If Lamb's statement that she was not involved[8] is to be credited, it would highlight that Lamb stood by in the meeting and did nothing to stop the release, even though she was fully aware of how differently her other Brach Manager, Sabbar Saiffee, had been treated. Had Lamb truly acted as the Complainant's advocate as the Agency contended, she would have informed the other managers about the differential way in which the Complainant was being treated vis-à-vis Shabbar Saiffee.

In an inconsistent statement, Janet Lamb also stated that she "concurred" with the release decision. ROI, Ex. F3, p. 8. John Crowley testified that he discussed the Report with Lamb at the meeting and that "we" all decided. Crowley, H.T., pp. 811, 813; ROI, Ex. F9, p. 11. Lamb in a statement not worthy of belief, testified that she never even received a copy of the Report. Lamb, H.T., pp. 939-940.

I find not only was Janet Lamb involved early on with the documentation of the Complainant (initially through her use of Wayne Box) and the initiation of the investigation, but she was also a decision-maker who implemented her release[9]. The Agency argues that any

---

8   Kathy Johnston also attempted to distance herself from any involvement. Although it was her Report that recommended the Complainant be released from her position and terminated from any other employment with FEMA, she nevertheless stated in her EEO affidavit that she had no involvement in the Complainant's release. Commission Ex. 4; ROI, Ex. F4, p 2.

9   Janet Lamb was the person that informed the Complainant to return immediately to Orlando for a meeting. This was the meeting where the Complainant was released from her position.

It is also noteworthy that the Agency had a progression of discipline policy in the Spring 2005. Saucier, H.T., p. 742. The progression under most

24

differential treatment between the Complainant and Shabbar Saiffee can be attributed to different managers making the decisions. However, I find that the Complainant has established that this explanation is not worthy of belief. I find that Lamb discussed the Report and was a decision-maker for the Complainant's release.

Janet Lamb was also the person that provided the Complainant with her last evaluation and memorialized on it that the Complainant was the subject of an investigation. Had Lamb been against the investigation and release, I do not believe she would have written what she did on the evaluation. As a federal employee who had been involved with hiring, I find that Lamb was aware of the negative impact this memorialization would have on the Complainant's ability to obtain future employment with other federal agencies. When the Complainant applied for other federal positions, the application process required her to submit her most recent performance appraisal with her job application. Complainant, H.T., p. 425.

I find that Janet Lamb was at the center of how the Complainant was treated, from the beginning of a documentation process which was designed to elevate the scrutiny of the Complainant to a heightened level, to Lamb's suggestion that an EEO Officer become involved, to Lamb's involvement in the administrative investigation, to her advocacy for the Complainant's release, to her public announcement to staff and managers that the Complainant

---

circumstances would begin with verbal counseling, followed by a written warning, and continue with harsher discipline as needed. This was not utilized in the Complainant's situation.

was investigated and released, and to her comments on the Complainant's evaluation which would raise questions by any future potential employer.

The manner in which the release and "administrative investigation" conducted by Kathy Johnston for misuse of supervisory authority is also troubling for several reasons.

First, as already discussed, this was not the normal procedure to use in a situation where two employees complain about a supervisor's managerial style.

Second, the Complainant was not provided with an adequate opportunity to review and respond to the statement that Kathy Johnston drafted under Complainant's name. The Complainant was not provided with such an opportunity even though there were no allegations of imminent harm. The Complainant received the drafted statement on May 23, 2005, and she was concerned that it did not accurately reflect what she had said in her interview. Complainant, H.T., pp. 319-320; ROI, Ex. F1, p. 5. Three days later, Janet Lamb informed Complainant to report for a meeting the next day. Complainant, H.T., pp. 320-321. The "next day" was the day Complainant was released.

Kathy Johnston had disseminated the Report and recommended that the Complainant be released from her position and terminated from any employment with FEMA. ROI, Tab 17, p. 17; Commission Ex. 4. When Johnston issued her Report, one of the documents she attached was "Statement of: [Complainant]," which was drafted in the first person as if the Complainant had written it. ROI,

26

Ex. F18, pp. 1-7; Davison, H.T., pp. 167-168. Although
this was presented as the Complainant's statement, it was
not. Instead, it was the statement that Johnston had
drafted which the Complainant said was not an accurate
representation of what she had said. When the Complainant
told Janet Lamb that she had not been able to respond yet
because she was on an out-of-town business trip, Lamb told
her there was nothing she could do. Complainant, H.T., p.
365. The Complainant was not able to submit her response
until June 1, 2005. Agency Exhibit 1. By then, she had
already been released from her Branch Chief position, but
she was still facing potential termination[10].

Third, as already discussed, the meeting regarding
the Complainant's release only lasted ten minutes and the
Complainant had not been provided with an opportunity to
present her own statement.

Fourth, after the Complainant was told of her
immediate release and to gather her belongings, while she
gathered her items, armed guards were posted just down the
hall outside of her work area[11]. Complainant, p. 366. John
Crowley corroborated that armed security guards were

10  The Complainant's Cadre was going to determine whether she would be
terminated from any future employment with FEMA. The Complainant's own response
was still necessary because there were differences between the Complainant's
response and the one which Kathy Johnston submitted under her name.   For
example, in Johnson's version the following words appeared:   "Ms. Johnson
addressed each of the accusations [lodged against me] and gave examples where
appropriate."  Commission Ex. 4. The Complainant, however, contended that it was
difficult to respond because she had not been provided with a copy of the Report
and only portions of the investigation were shared with her verbally. Agency Ex.
1.
    When the Complainant submitted her response, Johnson responded to the
Complainant by telling her that the version she had already sent was "the
essence of our discussion."  ROI, Ex. F18, p. 18.
11  This type of surveillance is troubling when viewed in light of the mere
informal  counseling  that  Shabbar  Saiffee  received  in  contrast  to  the
Complainant's treatment.

27

release, she was replaced with a white male. Complainant,
H.T., p. 377.

Fifth, the Report was forwarded to the Complainant's
Cadre in Region 4 seeking that she be terminated from any
future employment opportunities with FEMA.

As the Mitigation Region Director for Region 4, Todd
Davison was privy to the contents of the Report. Others
that saw the Report included Earnest Hunter, the
Mitigation Cadre Manager, and Mary Miller, the Acting
Regional Director. H.T., p. 162.

Todd Davison questioned the objectivity of the
Report, its balance, its scope and findings, and the
capacity and capabilities of the two newly hired employees
who had initially complained about the Complainant[12].
Davison, H.T., pp. 163, 166, 172, 209, 219-221. He
explained that termination is usually reserved for
situations where unlawful conduct has occurred or when
employees have endangered the personal safety of others.
Davison, H.T., pp. 172, 213. He opined that the Report's
recommendation for termination was a "tremendous leap"
from what was justified. He acknowledged that the
Complainant might improve in some areas, such as, trying
not to take on so much work. Davison, H.T., pp. 204-206.
However, he also indicated that the Complainant was
unnecessarily criticized for other things, such as,
changing directives during the time period when four
hurricanes hit in a row. Davison said that these

_____

12 Todd Davison had previously observed these two employees in a work setting
and based upon his observations, he had some concerns about them.

"suspect." ROI, Ex. F10, pp. 1, 10.

Even Kathy Johnson's supervisor, Louise Russell,
agreed that termination was not appropriate. Davison, pp.
214-215.

Todd Davison, Ernest Hunter, George Earwood, and Mary
Miller rejected the recommendation to terminate the

circumstances would result in changes having to be made. Davison, H.T., p. 175.

One of the allegations made against the Complainant was that she was a micromanager. Earnest Hunter pointed out that during this particular period the Complainant had "practically new staff," indicating a need for more supervision than what seasoned employees would need. ROI, Ex. F8, p. 5.

George Earwood[13], Special Assistant to the Region Director, stated that the administrative investigation was "suspect." ROI, Ex. F10, pp. 1, 10.

Even Kathy Johnson's supervisor, Louise Russell, agreed that termination was not appropriate. Davison, pp. 214-215.

Todd Davison, Ernest Hunter, George Earwood, and Mary Miller rejected the recommendation to terminate the Complainant. As an alternative, Todd Davison recommended the Complainant attend a training course and be assigned to work with a mentor on a project. Davison, pp. 162-164, 214-215; ROI, Ex. F18, p. 11. After the completion of these two requirements, the Complainant would be allowed to serve in available managerial positions. On October 25, 2005, a letter was issued which memorialized the above.

Complainant completed the training requirement. Complainant, pp. 247-252; Davison, H.T., p. 112. However, the Agency only offered her one mentoring assignment. Davison, pp. 182-184. Although the alleged purpose of the mentoring was to improve the Complainant's supervisory

---

13   The H.T. refers to this individual as Earwood, but the ROI lists him as "Yearwood." ROI, Ex. F10.

skills, the mentoring assignment offered to her was to work in a "think tank" with Libby Turner (Davison, H.T., p. 112), as opposed to an assignment shadowing another manager to improve interpersonal skills.

Todd Davison testified that the Complainant rejected the mentoring assignment described above. The Complainant explained, however, that she was already working on a project for Maria Vorel in Washington D.C., and that Vorel would have needed to approve her early departure. Complainant, H.T., p. 265. The Complainant provided unrefuted testimony that Vorel communicated to her that she needed her to remain for her full commitment because they were involved in massive hiring. Complainant, H.T., 259.

In the meantime, Libby Turner was assigned to a new assignment in Washington D.C. Complainant, H.T., p. 260. Todd Davison acknowledged that it was not clear if the mentoring assignment ever got off the ground and confirmed that no other mentoring assignment was offered to the Complainant. Davison, H.T., p. 182. In short, as summarized by the Complainant, Hurricane Katrina occurred and the mentoring assignment went "off the radar." Complainant, H.T., p. 258. Based upon the evidence presented by both parties, it is not clear that the "offer" for Complainant to work with Libby Turner was an offer that the Agency was equipped to carry out because very soon after it was made Turner was reassigned to a different project. Even if Libby Turner had been available to work with the Complainant, I find that the Complainant, though no fault of her own, was not able to avail herself

30

of that particular mentoring assignment. This is because Complainant was already committed to work on the D.C. project with Maria Vorel.

The Complainant testified that the Agency asked her in 2007 if she were available for a mentoring assignment and although she answered in the affirmative, no such assignment was offered. Complainant, H.T., pp. 260-261.

Since the Complainant's release, she has not been offered any supervisory positions in her Cadre. Davison, p. 112. The Complainant was offered one management position from a different Region[14], but the offer was retracted based upon the recommendation of Todd Davison. Davison, H.T., p. 182; Complainant, H.T., p. 242. Ronald Holmes was placed in the position instead. Complainant, H.T., p. 241. Davison stated that the Complainant could not serve in a managerial role without first completing a mentoring assignment. Davison H.T., p. 182. However, as noted above, it was not the Complainant's fault that she had not completed a mentoring assignment.

Although FEMA contended that all the Complainant needed to do to obtain further managerial positions was to take one course (which she did) and fulfill one mentoring assignment, the evidence is clear that she was not provided with a realistic opportunity to be mentored so she could regain her responsibilities, status, and income. It also is significant that had it not been for Janet Lamb's campaign against the Complainant in the first place, the Complainant would not have been placed in this predicament.

---

14  This was Region or Cadre 6.

There were few positions that the Complainant served in after her release.  She briefly worked on a project for Maria Vorel in Washington D.C.  Complainant, H.T., pp. 238-239.  In addition, the Complainant made herself available to work in a non-management introductory level position[15] in Baton Rogue, Louisiana. Complainant, H.T., p. 239, 243-244. Although the Complainant took this job, she found working with a decreased title and salary to be humiliating. Complainant, H.T., pp. 243-244.  She was working in a diminished capacity and was the subject of gossip. Complainant, H.T., pp. 256.

The Complainant felt publically disgraced and began to experience headaches, sleeplessness, and anxiety. ROI, Ex. C4, p. 6. For some undisclosed period of time she sought counseling.  ROI, Ex. C4, p. 6.  Her friend, Thelma Reid, submitted a letter stating that the Complainant had experienced crying binges and felt insecurity for her future. ROI, Ex. F21, pp. 1-2.

Janet Lamb had already given public announcements to Complainant's co-managers and staff that the Complainant was released due to an investigation. I find these individuals did not have a right or need to know this information. Given the fact that the Complainant was responsible for hundreds of employees, when Lamb made her announcements numerous employees were going to speculate about the details. It is common sense that this contributed to more rumors. The end result was that the Complainant's reputation was tarnished from the public announcements and the rumors. It is not surprising that

---

15 The Complainant described the position as slightly above that of an administrative assistant. Complainant, pp. 239, 243-244.

32

the Complainant heard from many employees asking her to
clarify what had happened. The Complainant was questioned
why she was not being deployed. ROI, Ex. A1, p. 6. The
Complainant was told by one employee that people were
saying she had walked off the job, while another heard she
had been escorted out in handcuffs. ROI, Ex. C4, p. 6;
Complainant, H.T., pp. 245-246.

Given the above, had the Complainant continued to
make herself available to work in less desirable positions
than what she normally worked, she would have only
contributed to the demise of her own reputation. To
mitigate her damages, she is not required to voluntarily
demote herself by working in non-comparable positions.
The Complainant had a consistent employment history of
managerial positions. She was not required to work in non-
managerial jobs at lower pay and prestige.

It is noteworthy to point out that when the
Complainant attempted to find other comparable federal
employment, she was stuck with her last performance
appraisal which memorialized that she was released
pending the outcome of an administrative investigation.
ROI, Ex. F2, p. 75. The Complainant testified that when
she applied for other federal jobs the potential employers
required her to submit her last evaluation. I find that
this significantly decreased the Complainant's chances to
obtain other federal employment.

Based upon the above, the Complainant has established
that the Agency's articulated reasons for its actions are
pretextual. The Complainant had a very good consistent
work record with the Agency, including her performance in

33

her most recent position for which she was nominated for an award on January 6, 2005[16]. Agency Ex. 2. She had received awards and bonuses throughout her career and Clay Saucier was pleased with her as a manager. While there was room for improvement with her interaction skills, as Clay Saucier testified, she was receptive to improving and began holding meetings to deal with any concerns of the staff. Saucier was pleased with her progress, but before measures could barely get off the ground, I find that Janet Lamb continued in her pursuit to get rid of the Complainant.

Due to Janet Lamb's activity in encouraging written complaints against the Complainant and a subsequent investigation, the Complainant was subjected to heightened scrutiny. This heightened scrutiny was in direct contrast to how Janet Lamb treated her other Branch Manager, Shabbar Saiffee. There was no evidence that Saiffee had spoken with Lamb about how she treated non-minorities or if she had used the word darkie before. There was no evidence that he informed her that he would file an EEO complaint against her. Saiffee did not share any of the Complainant's protected classes for which she claimed discrimination and retaliation. He was treated differently under same or similar circumstances. While the Complainant lost her position and in a practical sense, her employment, Saiffee was merely verbally "counseled."

Based upon the foregoing, the Complainant has established that she was retaliated and discriminated against when the Agency subjected her to an administrative

16 I find that the Complainant was nominated for this award before she raised her concerns with Janet Lamb.

investigation, released her, and did so with armed security guards being positioned in the area.

### Complainant's Authority Was Undermined & the Agency Publically Announced She Was Investigated and Released

#### Hostile Work Environment

In order to establish a prima facie case of hostile work environment, the Complainant must show she belongs to a protected class, the harassment was severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and that the severe or pervasive harassing conduct would not have occurred except for membership in the protected class. See Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990); Hall v. Gus Constr. Co., 842 F.2d 1010 (8th Cir. 1988); Hicks v. Gates Rubber Co., 833 F.2d 1406 (10th Cir. 1987); McKinney v. Dole, 765 F.2d 1129 (D.C. Cir. 1985); Olson v. HUD, EEOC Appeal 05930413 (June 16, 1994); Taylor v. Air Force, EEOC Appeal No. 059202888 (Nov. 28, 1990).

Unless the conduct is very severe, a single incident or group of isolated incidents will not be regarded as discriminatory harassment. See Banks v. TVA, EEOC Appeal No. 01911784 (Sept. 13, 1991). To determine whether an environment is sufficiently hostile or abusive, one must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). To be actionable, the

35

environment must be objectively and subjectively
offensive; one that a reasonable person would find hostile
or abusive, and one that the victim in fact did perceive
to be so.

The Complainant was told by a staff member in 2001
that Janet Lamb had called her a "micromanager."
Complainant, H.T., p. 283. In June 2001, the
Complainant's staff had also informed her that Lamb had
tried to woo them away from her with promises of
promotions and support if they would come work for Lamb.
ROI, Ex. F1, p. 15; Complainant H.T., p. 283.

Ernest Hunter recalls the Complainant complaining
during Hurricane Isabel[17] that Janet Lamb was undermining
her by providing staff with different directions than
what the Complainant had provided. Hunter, H.T., pp. 589,
596, 600. However, the Complainant acknowledged that Lamb
had the authority over her and as such, Lamb could set
the directives. Complainant, H.T., p. 657. As already
discussed previously in this Decision, the nature of
relief work in disaster areas often results with some
directives having to be changed.

The above, however, was not the Complainant's only
complaint against Janet Lamb during this timeframe. The
Complainant was concerned because she had been told[18] that
Lamb had used the word darkie. Complainant, H.T., p. 290-
291.

Ernest Hunter recalled that a managers meeting was

---

17 Hurricane Isabel occurred in 2003.
18 Complainant testified that Craig Toft told her that in 2001 Janet Lamb had
used the word darkie when commenting on how many blacks were working for FEMA.
Reportedly, after Lamb said this word, she quickly apologized explaining that
this was not a frequent term she used. Complainant, H.T., pp. 276-278.

held to address tensions that were developing during the Hurricane Isabel relief effort. Those in attendance besides himself included the Complainant, Janet Lamb, Todd Davison, Clay Saucier, Shabbar Saiffee, Lonnie Ryder, and Rick Mayson. ROI, Ex. F1, p. 1, 16. During this meeting Complainant did not single out Janet Lamb or otherwise mention her name as a source of her concerns, even though she had a concern based upon somebody telling her that Lamb had used the word "darkie." Complainant, H.T., pp. 289-291. Complainant's information was not based upon personal knowledge and when she was asked who had used the word, Complainant declined to name anybody. Instead, she stated that it was somebody in senior management who was in the room. Complainant, H.T., pp. 291.

Todd Davison did not recall Janet Lamb's name being mentioned in the meeting, but he thought that Clay Saucier at some point in time informed him that somebody overheard somebody say that Lamb had used the word. Davison. H.T., pp. 94-95, 194-195. Todd Davison, Ernest Hunter, and the Complainant had not personally observed Lamb using such language. H.T., pp. 114, 608. The evidence shows that this issue was not pursued by the management team because specifics were lacking, no one was identified by name at the meeting, and what little information was available was hearsay. The information that the Complainant possessed was second hand and she was unwilling to fully share it at that time.

Thus, the meeting turned to other issues. One of the other issues pertained to whether there were some "angry

37

white males" in the workforce that were not happy they were being released due to lack of work. H.T., pp. 190-194. Some thought they were angry because they were not placed in supervisor positions over people of color, while others disagreed with this analysis. Davison, H.T., pp. 190-196; Complainant, H.T., p. 295.

The Complainant claimed that she had been subjected to a hostile work environment since 2001. To support this claim, Complainant stated she had been subjected to "undermining comments, gossip, disparaging remarks, and racially derogatory language" made about her and others. ROI, Ex. F1, pp. 3, 14. However, this is a conclusory statement that is void of detail. Information was lacking regarding who, what, when, where, why, etc. The vast majority of Complainant's information was based upon hearsay. The sources of her information went mostly unnamed and these individuals did not testify on her behalf. Although I find that the Complainant believed what she was told by others, she had no personal knowledge of it.

The examples covering 2001 through 2004 that the Complainant testified about based upon her own personal knowledge did not reflect a hostile environment. These examples included Janet Lamb commenting: (1) in 2001 that a particular employee (who happened to be Filipino descent) was difficult to understand; (2) in 2001 that a particular employee (who happened to be an African-American female) wore too much jewelry; (3) in 2001 that a particular employee (who happened to be African-American) was too loud; (4) that a supervisor (who

happened to be a white male Caucasian) was having difficulty managing two employees who did not get along (who happened to be African-American females); (5) in 2001 that an employee (who happened to be an African-American female) was dressing too casually by wearing a shirt with the word "bootylicious" on it; (6) in 2001 that African-Americans should not go into the field, per orders of the Federal Coordinating Officer, due to threats made by the KKK; (7) in 2002 or 2003 that DAEs should not be left out in the field too long because they tend to become involved in relationships with other people; (8) in 2002 or 2003 that an employee (who happened to be an American Latin male) could not be depended upon because he chased women; and (9) in 2003 that an employee (who happened to be from Guam) was scattered and not very focused.  Complainant, H.T., pp. 270, 272-277; ROI, Ex. F1, p. 15.

Not enough information was provided to convince the undersigned that the comments noted above were not legitimate concerns irrespective to which protected categories the employees may have belonged. For example, although relief workers work in tough environments because they are deployed to disaster areas, the Complainant had also shared concerns about some relief workers dressing too casually and there was no evidence to even suggest that wearing clothing with "bootylicious" written on it would have been considered appropriate attire.

While it is noted that the Complainant viewed Janet Lamb as being overly critical of the minority workers,

39

she did not set forth sufficient detail to show that Lamb treated them less favorably <u>because</u> <u>of</u> their minority status. Complainant concluded that non-minority workers could dress inappropriately or speak with hard to understand southern accents (as opposed to a foreign accent) and yet, these situations would not draw negative comments by Lamb. Complainant, H.T., pp. 271-272. However, the Complainant's descriptions of these incidents were just too vague and conclusory in nature. There was no corroboration. Significantly, the Complainant did not establish that Lamb had not confronted the non-minority employees outside of the Complainant's presence. The examples also did not represent instances of severe or pervasive harassment based on race, sex, or retaliation that would alter the terms and conditions of employment.

The Complainant also provided evidence that she heard of Janet Lamb's rejection of an elderly employee that Lamb wanted to get rid of because she thought of him as being too old. Complainant, H.T., pp. 349-352; ROI, Ex. F2, pp. 39, 43. While the above illustrates negative stereotyping based upon age, this example does not support the Complainant's claims which are based upon race, gender, and EEO activity. It does, however, explain why the Complainant was growing more and more impatient with Janet Lamb.

I also find that the Complainant could not show that Janet Lamb had used the word darkie. The Complainant <u>strongly</u> <u>believed</u>[19], based upon second hand information,

---

[19] Although not known to the Complainant until the hearing, Janet Lamb did hear

that Lamb had used this word. However, there was no evidence presented by any witness that actually witnessed any such incident.

Although the above explains why the relationship between the Complainant and Janet Lamb had become tense years ago, it (along with the other examples described above) does not meet the legal standard for establishing that Janet Lamb had subjected the Complainant to a hostile environment during 2001 through 2004 because of her race, gender, or any EEO participation.

I find that from June 2001 through 2004, the Complainant was not subjected to a hostile work environment on the bases of her race, gender, or EEO activity. There was no conduct proven to have occurred that was physically threatening or humiliating. In addition, the Complainant's work performance was not affected by Janet Lamb's alleged conduct. The evidence showed that during this timeframe the Complainant thrived in her career. Complainant, H.T., pp. 230-235.

The remainder of the Complainant's claim pertains to whether she was subjected to a hostile work environment from January 2005 and continuing, during which time her authority was allegedly undermined and misrepresented by other staff and management officials, and after the release of the administrative investigation, said investigation was broadcast by employees and management

---

an employee use the word darkie and took no action to correct the behavior. Lamb, H.T., pp. 1001-1004. Lamb testified that she was walking down the hall when she heard three male employees talking and one of them (she was not sure which one) used the word darkie. Lamb acknowledged that she took no corrective action. Her explanation was merely that she did not want to confront them and she was leaving. Lamb, H.T., pp. 1000-1005.

officials.

The facts pertaining to the remainder of the claim have been extensively addressed earlier in this Decision and do not need to be repeated in detail. I find that the Complainant was undermined through the heightened scrutiny that Janet Lamb subjected her to which was based upon her race, gender, and EEO protected activity. See the earlier sections of this Decision which pertain to retaliation, disparate treatment and pretext.

As previously explained, it was this heightened scrutiny which began in January 2005 when Janet Lamb instructed Wayne Box to document the Complainant when Lamb was not the Complainant's supervisor. This led to the April 2005 administrative investigation which, in turn, lead to the Complainant's abrupt release on May 27, 2005. Additionally, Janet Lamb subjected the Complainant to unnecessary embarrassment and degradation when she publically announced to staff and managers that the Complainant had been released from her position after an administrative investigation. ROI, Ex. F2, p. 159 (e-mail from Cotilda Harvey); Lamb, H.T., p. 963.

Janet Lamb told Complainant's staff that she had been under investigation and was released. ROI, Ex. F2, p. 159. On May 31, 2005, Janet Lamb held a meeting with staff and informed them that: (1) CEO staff had filed a complaint against the Complainant; (2) the Complainant had been under investigation by Headquarters; (3) the Complainant was released; and (4) headquarters requested the release. Id. Lamb acknowledged telling the Complainant's co-managers that she had been investigated. Lamb, H.T., p. 963.

Due to the above, it is not surprising that the Complainant heard from many employees asking her to clarify what had happened. The Complainant was routinely questioned why she was not being deployed. ROI, Ex. A1, p. 6. The Complainant was told by one employee that people were saying she had walked off the job, while another heard she had been escorted out in handcuffs. ROI, Ex. C4, p. 6; Complainant, H.T., pp. 245-246.

I find that during 2005, the Complainant was subjected to a hostile work environment on the bases of her race, gender, and EEO protected activity. What occurred during this timeframe was severe and altered the terms and conditions of Complainant's employment. Although the Complainant was still a DAE theoretically able to continue working for FEMA, the public announcements described above not only humiliated the Complainant, but harmed her reputation and impacted on her employment opportunities.

## V. LEGAL CONCLUSION

I find that the Complainant was discriminated against on the basis of race (African-American), sex (female), and retaliation (prior EEO activity) when: (1) she was wrongfully subjected to an administrative investigation which began in April of 2005, and culminated on May 27, 2005, when she was abruptly released from her Branch Manager position in Orlando, Florida, and said release occurred with the additional embarrassment and degradation of security guards positioned in the area; and (2) she was subjected to an ongoing hostile work environment beginning in January 2005, when her authority was undermined by Janet Lamb and Lamb publically announced to

43

employees and management officials that the Complainant had been investigated and released.

## VI. RELIEF

### Compensatory Damages

Section 102(a) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, authorizes an award of compensatory damages as part of make-whole relief for intentional discrimination in violation of Title VII.  See West v. Gibson, 119 S.Ct. 1906 (1999); Wilson v. SSA, EEOC Appeal No. 01971629 (February 28, 2000). Compensatory damage awards must be limited to the sums necessary to compensate a Complainant for actual harm, even if the harm is intangible.  See Wilson, EEOC Appeal No. 01971629.

Compensatory damages may be awarded for past pecuniary losses, future pecuniary losses, and non-pecuniary losses, which are directly or proximately caused by the agency's discriminatory conduct. Finlay v. Runyon, EEOC No. 01942985 (April 29, 1997). Pecuniary losses are "out of pocket expenses incurred as a result of the employer's unlawful action, including job hunting expenses, moving expenses, medical expenses, psychiatric expenses, physical therapy expenses, and other quantifiable out of pocket expenses."  Demeuse v. USPS, EEOC Appeal No. 01950324 (May 22, 1997).  Past pecuniary losses are the pecuniary losses that are incurred prior to the resolution of the complaint. Future pecuniary losses are losses that are likely to occur after resolution of a complaint.  Non-pecuniary losses are losses that are not subject to precise quantification, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character and reputation, injury to credit standing, and loss of health.

Finlay at EEOC No. 01942985.

## Past Pecuniary Losses

I find that the Complainant is not entitled to $10,000 for past medical expenses for either a workers compensation injury or counseling sessions. See H.T., pp. 422; ROI, Ex. C4, p. 5. To the extent the Complainant was seeking relief for her on-the-job injury, her claim is denied. Any expenses pertaining to an on-the-job injury should be handled by the Department of Labor's Office of Workers Compensation Programs. This is not the proper forum to determine what the Complainant may or may not be entitled to for medical expenses associated with an on-the-job injury. In addition, the Complainant did not prove her claim for the need to be reimbursed for medical expenses associated with attending any counseling sessions. The record is sparse regarding this topic and there were no receipts or bills to establish that these expenses have been incurred and, if so, what the costs have been.

## Non-Pecuniary Damages

I find that the Complainant is entitled to non-pecuniary compensatory damages in the amount of $60,000 for the emotional pain, suffering, mental anguish, humiliation, injury to professional standing, and injury to reputation. I find that the Agency's discriminatory conduct directly and proximately caused the Complainant's embarrassment and humiliation. The Complainant was publically disgraced and this lead her to suffer from headaches, sleeplessness, and anxiety. ROI, Ex. C4, p. 6. She experienced crying binges and she sought counseling for an undisclosed amount of time. ROI, Ex. F21, pp.

45

1-2; ROI, Ex. C4, p. 6.

The Complainant was the subject of gossip which ranged from stories having her walking off of the job to being taken out in handcuffs by armed guards. The Agency also made public announcements to staff and managers that the Complainant had been investigated and released from her position. The pubic announcements made by the Agency were especially egregious because it ensured that numerous employees would hear the information, thus making the humiliation more severe and the rumor-mill run rampant. Although the statement was technically true, had it not been for the discrimination and retaliation the Complainant would not been investigated, much less released from her position. Although the Complainant was not present when Janet Lamb made the public announcements, the Complainant learned what had occurred and was humiliated by it. Her reputation was harmed.

Complainant is entitled to be compensated for the actual harm she suffered, even where the harm is, in part, intangible. Cobey Turner v. Dept. of the Interior, EEOC Appeal No. 01953690 (April 27, 1998). In considering the amount of non-pecuniary damages to award in this case, I may take into account the harm done to the Complainant and consider its severity and duration which were caused by the Agency's actions. Finlay v. Runyon, at EEOC No. 01942985. I find that what occurred was severe and its duration continues to this day because the Complainant has been precluded from working in managerial positions at FEMA. Remaining out of the workforce has only contributed to her humiliation because she has not been restored to her original stature.

The Commission has held in other cases that the lack of

medical documentation or expert testimony does not render an award of non-pecuniary compensatory damages itself inappropriate. The Commission has recognized that neither evidence from a health care provider nor expert testimony in general is a prerequisite for recovery of compensatory damages for mental or emotional distress. Johnson v. Interior, EEOC Appeal No. 01961812 (June 18, 1998); Lawrence v,. USPS, EEOC Appeal No. 01952288 (April 18, 1996). A complainant's own testimony, along with circumstances of a particular case, can suffice to sustain the complainant's burden. See Lawrence, EEOC Appeal No. 01952288.

I find that the discrimination in this case was inherently degrading and humiliating to the Complainant. In addition to the evidence presented at the hearing, common sense dictates that having your colleagues informed about your removal due to an administrative investigation and then not being allowed to work in any managerial positions, although you are still "technically" considered an employee, would cause distress and uncertainty. For all practical purposes the Complainant was taken out of the workforce for a protracted period of time and she missed opportunities for other career enhancement. I find that the Complainant has established a causal nexus between her emotional pain and the actions of the Agency in this case.

The amount of non-pecuniary damages should not be excessive and should comport with the amounts awarded in similar cases. Id. Commission cases most closely on point have awarded $50,000 to $52,000. For example, in Arreola v. Ashcroft, EEOC Appeal 01A03342 (January 17, 2002) on appeal the Commission increased the non-pecuniary damages award from

47

$35,000 to $52,000 to ensure the Complainant was made whole. In that case the Complainant's credit rating and reputation were tarnished after he was terminated because of financial problems encountered after his discharge and false rumors were spread that he assaulted a convenience store clerk. In the case at bar, the Complainant's reputation was not only tarnished in Orlando, Florida, but throughout FEMA's regions across many locations, making the damage to her reputation extensive. This was significant.

The Commission awarded $40,000 in a nonselection case where the complainant suffered mental anguish, loss of enjoyment of life, mood swings, weight loss, and loss of sleep. Woodard v. Labor, EEOC Appeal No. 01A11604 (October 11, 2002).

In Brown v. Potter, EEOC Appeal 07A30050 (July 14, 2004), the Commission affirmed an administrative judge's award of $50,000 in non-pecuniary damages for inconvenience, mental anguish, loss of enjoyment of life, humiliation, public embarrassment, and diminished self-worth. In that case the Agency failed to provide a reasonable accommodation and sought to terminate the complainant.

Considering all relevant factors discussed above, including my review of comparable cases in which non-pecuniary damages have been awarded, I find that the Complainant is entitled to an award of $60,000 in non-pecuniary compensatory damages for the emotional distress she suffered as a result of the discrimination of the Agency.

48

## Future Pecuniary Losses

The Complainant has sought front pay. Front pay is awarded when an employee would otherwise have been able to return to the workplace, but for the discriminatory practices of the employer. The Commission has identified three circumstances when front pay may be awarded in lieu of reinstatement. They are: (1) when no position is available; (2) where a subsequent working relationship between the parties would be antagonistic; or (3) where the employer has a long standing record of long-term resistance to anti-discrimination efforts. Cook v. United States Postal Service, EEOC Appeal No. 01950027 (July 17, 1998).

The Complainant has not established circumstances (1) or (3) above. The Agency has represented that there is a position for the Complainant. See Agency's Post-Hearing Brief, p. 22. In addition, the Complainant has not shown that FEMA has a long standing record of long-term resistance to anti-discrimination efforts. Despite a finding of discrimination in this case mostly due to the actions of Janet Lamb, it was not shown that either FEMA or the Mitigation Division has a history of resistance to anti-discrimination efforts. To the contrary, the evidence showed that efforts were being made to increase diversity within the Mitigation Division and the Complainant was part of that effort.

With respect to (2) above, I find that a subsequent working relationship between the parties would be not antagonistic as long as the Complainant does not have to report to Janet Lamb (and/or Wayne Box) or otherwise have Lamb and/or Box above her in FEMA's hierarchy. A subsequent working

49

relationship between the parties would not be antagonistic as long as the requirements noted below are followed.

The mentoring requirement shall be removed (see Corrective Action section of this Decision). The Agency shall immediately place the Complainant in a comparable managerial position and while doing so the Agency must abide by the other specific requirements set forth in the Corrective Action section which will ensure that the subsequent working relationship between the parties is not antagonistic. See page 66 of this Decision.

### Back Pay

The Agency contends that the Complainant is not entitled to back pay because she failed to mitigate her damages when she did not complete a mentoring assignment, a requirement set by the Agency before it would assign her to another managerial position.  It also asserts that she should have made herself available for non-managerial jobs in the interim she could have continued working as a DAE. Although the Agency has technically kept the Complainant within its database as a DAE employee, by requiring her to obtain mentoring, but then not providing her with a viable mentoring opportunity, it precluded her from working in any managerial positions at FEMA. I also find that had it not been for the discrimination, the Complainant would not have been required to obtain mentoring in the first place. Thus, this requirement should not have placed upon the Complainant. In addition and as already discussed previously, the Complainant was not required to demote herself by working in non-managerial job with less prestige and less salary.

50

(1) Had it not been for the discrimination, the Complainant would have continued to work in Orlando, Florida, in her Branch Chief position until she was offered the position in Region 6. Thus, she is entitled to back pay for the duration of time that the Branch Chief position in Orlando was filled by anybody[20] up to the point of time that she was offered the position in Region 6 referenced below in paragraph (2). Her back pay shall be calculated at her base salary (at $80,000 per year for any regular[21] hours worked) plus overtime hours worked paid at the overtime rate of pay minus any interim earnings[22]. The amount of any overtime hours worked by her replacement(s) (up to the point of time that she was offered the position in Region 6) shall be determined and this amount of hours shall then be paid to the Complainant in overtime pay.

(2) Had it not been for the required discriminatory mentoring requirement, the Complainant would have been assigned to the management position in Region 6, which had previously been offered to her, but then retracted because she had not completed her mentoring assignment. The evidence showed that Ronald Holmes was placed in the position. Thus, the Complainant is entitled to back pay for the duration of time that this position was filled[23] at her base salary (at

---

20 The Agency shall furnish relevant information to the Complainant so that verification may be made of the back pay calculation. This requirement applies to this position (and overtime hours worked) as well as the position referenced in paragraph number (2) below.
21 "Regular" hours refer to hours paid at the Complainant's base rate of pay, as opposed hours compensated at the rate for overtime pay.
22 The Complainant shall furnish relevant W-2s and/or 1099s so verification may be made of any interim earnings. This requirement is applicable for all years for which she will receive back pay.
23 If Ronald Holmes was subsequently replaced by another individual this shall not cut off the back pay. The Complainant is entitled to back pay for the

$80,000 per year for any regular hours worked) plus overtime hours worked paid at the overtime rate of pay minus any interim earnings. The amount of any overtime hours worked by Ronald Holmes and/or his replacement(s) shall be determined and this amount of hours shall then be paid to the Complainant in overtime pay. In the event that the title of this position changed due to a temporary office changing into a long term recovery office, but the duties remained significantly the same and Holmes (or his replacement) continued to perform the work, then this shall be considered a position for which the Complainant is entitled to back pay.

(3) The evidence is too speculative to allow for back pay after any elimination of the position referenced immediately above in paragraph (2). The Complainant testified about how many days she had worked in past years.  However, due to the nature of FEMA's business its need for employees to perform disaster relief varies significantly from year to year and varies within FEMA's regions throughout the United States. Needs are dependant upon whether a disaster strikes and, if so, the extent of destruction. The record was void of what FEMA's needs were after the offer for work in Region 6 was withdrawn. Therefore, the Complainant has not established that she is entitled to any back pay other than the back pay previously described in paragraphs (1) and (2) above.

### Adjustment of Back Pay for Time Unavailable

Notwithstanding paragraphs (1) and (2) above, the Complainant is not entitled to nine weeks of back pay during

---

duration of time that anyone served in this position up to the date of this Decision. See also footnotes 20 and 22.

52

the time she was caring for her mother and unavailable to work. The Complainant testified that she cared for her mother on three separate rotations for two to three weeks each time. Her first rotation began in November 2005. Complainant, H.T., pp. 254-255, 578-579. Thus, the back pay calculation shall treat the Complainant as unavailable for work for the first three weeks in November 2005. Because this was a rotation system (taking turns with other relatives), the Complainant's second rotation would not have occurred before 2006, but she did not present enough information when her second and third rotation began. Thus, back pay shall be calculated assuming her second rotation would have made her unavailable for work during the first three weeks in January 2006, and her third rotation would have made her unavailable for the first three weeks in March 2006.

## Per Diem

The Complainant is not entitled to per diem monies. While it is recognized that had she worked she would have received a per diem allowance, these monies are for living expenses while working for FEMA when an employee is away from their personal residence. The Complainant is not entitled living expenses that she did not incur.

## Bonus/Award Monies

Complainant is not entitled to any bonus money. While it is recognized that she had received bonus monies in the past, there was no evidence to establish that she received such bonuses every year or that FEMA had monies available to pay bonuses after the Complainant was released.

53

### Attorney Fees

A prevailing party is entitled to a properly supported award of attorney fees. 29 C.F.R. 1614.501(e). The Complainant filed a petition seeking $167,354.20 in attorney fees. The attorney fees were based upon a billing rate of $225 for Ray Smith and $200 for his associate, Melinda Garlington, during the time period from May 27, 2005, until June 9, 2007. See Complainant's Petition for Attorney Fees and Costs. The attorney fees were based upon billing rate of $325.00 for Ray Smith and $260.00 for his associate after July 31, 2007. Id.

The Agency filed a Response to Complainant's Petition. The Agency contests the hourly fee amount for both attorneys, pointing out that the Complainant failed to substantiate the appropriate community rate. The Agency also argues there was no documentation to show that the attorneys had been previously been paid at the requested rates in other cases other than Mr. Smith's own affidavit. In addition, the case was described as not complicated and the attorneys' work not that good to justify the high hourly rates.

Based upon the above, the Agency requests that Ray Smith's rate be reduced to $225 per hour and his associate, Melinda Garlington, be paid $150 per hour. The Agency did not contest the paralegal's rate of $100 per hour.

In addition to the rate, the Agency objects to the amount of hours the Complainant's attorneys charged for, describing them as excessive and unnecessary. Examples were provided, such as, having two attorneys present for a four day trial with the only observable role of the associate

54

attorney being that of passing documents or instructive notes from the Complainant to the primary counsel. Another example was charging for reviewing arbitration materials when this case never went to arbitration. Likewise, an objection was made to the Complainant's attorneys seeking compensation for preparing for oral argument on the motion for summary judgment when oral argument was not scheduled for this motion. Billings for emails were also contested based upon them being billed for by a minimum of fifteen minute time periods, irrespective the emails only being two to three sentences long.

In determining the amount of fees to award, part of the analysis includes determining the correct hourly rate. The Agency's statement that the fee should be reduced is well taken. I find that the Complainant has not set forth evidence of the relevant community standard. The Supreme Court has held that a reasonably hourly rate is to be measured by the prevailing market rates in the relevant community. Blum v. Stenson, 465 U.S. 886, 888 (1984). The "burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of comparable skill, experience and reputation." Blum, 465 U.S. at 895; see also; Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994). "For the purposes of determining the prevailing market rate, the relevant community is the area where the agency facility and the complainant are located." Cook v. USPS, EEOC Appeal No. 01A02390 (quoting Black v. Army, EEOC Appeal No. 01921158 (Jan. 14, 1993)).

In the case at bar, the discrimination occurred at the Agency's facility in Orlando, Florida. However, the Petition focuses on claimed rates in Atlanta, Georgia, where the discrimination did not occur and where the Complainant does not live. Neither party presented any information of what the prevailing rates are for the Orlando, Florida, area. However, the burden was on the Complainant to show the appropriate prevailing rates or that there was not competent local counsel in the Orlando area to handle this case. Neither of these things were done.

Not only do I find the hourly rates charged to be excessive, but some of the requests should not be paid at all. I find that the appropriate hourly rate, for the time billed for thus far in this case, is $225 per hour for Ray Smith and $150 per hour for Melinda Garlington. The rate for the paralegal of $100 per hour was not challenged and thus, it will not be disturbed.

I find that fees billed from May 2005 through part of October 2005 are premature. "The Commission's complaint processing regulations explicitly provide that fees for legal services performed prior to the filing of the complaint are allowable when the Commission affirms on appeal an administrative judge's decision finding discrimination after an agency takes final action by not implementing that decision." Savage v. USPS, EEOC Appeal No. 01A32565 (July 14, 2005); 29 C.F.R. Section 1614.501(e)(1)(iv). This has not happened yet, so a request for fees before October 10, 2005 (the date of the Complainant's formal complaint) is premature.

56

I further find that the fees for the following claimed items set forth below are denied:

1) 1.5 hours on November 14, 2006, for arbitration preparation and conference with client. The conference was billed together with the claimed arbitration preparation and cannot be separated. In any event, this case was not scheduled for and did not go to arbitration, thus, the request for such fees are denied.

2) .60 hour on December 15, 2006, for review of post arbitration brief. This is not applicable to the case at bar for the reasons set forth in number 1 above.

3) 2.5 hours on February 7, 2007, for multiple items with the most time consuming task being the preparation of a letter and subpoena to BOA. There is no subpoena power in the administrative hearing process and thus, if a subpoena was issued it should not have been and time claimed for such activity is denied.

4) .50 hour on March 8, 2007, for review of FEMA's civil procedure rules. This is denied because FEMA has no civil procedure rules to govern the administrative hearing process.

5) 2.50 hours on April 27, 2007, for preparation of "hearing" on Agency's Motion for Summary Judgment. A Pre-Hearing Report was issued on January 18, 2007, which memorialized the denial of the summary judgment motion and thus, there was no need to prepare to argue the motion.

6) .25 hour by unknown "VHW" which reflects a billing rate more than that of a paralegal. The only specific information set forth by the Complainant in her petition for fees was for Ray Smith (RSS), Melinda Garlington

57

(MAG), and paralegals. Thus, work performed by "VHW" is denied.

7)   12.75 hours for various items in May 2007 by unknown "VHW." Refer to number 6 above.

8)   10.5 hours for various items in July 2007 by unknown "VHW." Refer to number 6 above.

It should be noted that when the Complainant submitted her fee petition she submitted claimed totals on a month by month basis which grouped the hours and fees together for the paralegal, the associate attorney and the primary attorney, even though the requested fees for these individuals were at different rates. See AJ Exhibit 1. Only by the time consuming process of reviewing the attached billing statements for each month could it be determined how much time each individual had worked on the case. These charges should have been separated by the Complainant when the Petition was filed.

When the Agency requested a rate reduction the Agency did not take the time to recalculate the figures. Although the Agency requested lower billable rates for the attorneys and to have some requested hours excluded, it did not contest the mathematical calculations of the Complainant's figures in AJ Exhibit 1.

The undersigned Administrative Judge has recalculated and adjusted the figures in AJ Exhibit 1 based upon her rulings made above, i.e., a rate of $225 for Ray Smith, a rate of $150 for Melinda Garlington, a rate of $100 for the paralegal, the correction for the premature request for fees occurring before the formal complaint was filed, and the denial of fees for numbers 1-8 listed above. Based upon these adjustments the new calculations are:

58

Case 1:13-cv-01382-RDM   Document 16-1   Filed 11/12/14   Page 63 of 73

| | |
|---|---|
| October 10, 2005 to to October 31, 2005 | $618.75 |
| November 2005 | $743.75 |
| December 2005 | $675.00 |
| January 2006 | $1068.75 |
| February 2006 | $4006.25 |
| March 2006 | $1687.50 |
| April 2006 | $1237.50 |
| May 2006 | $1106.25 |
| June 2006 | $506.25 |
| July 2006 | $618.75 |
| August 2006 | $1012.50 |
| September 2006 | $3,018.75 |
| October 2006 | $6,168.75 |
| November 2006 | $10,581.25 |
| December 2006 | $12,496.25 |
| January 2007 | $9,300. |
| February 2007 | $8,049. |
| March 2007 | $3431.25 |
| April 2007 | $6,875. |
| May 2007 | $41,043.75 |
| June 2007 | $1,732.50 |
| July 2007 | $11,625. |
| TOTAL: | $127,602.75 |

However, the above does not complete the fee analysis. I find that a significant number of hours claimed are excessive and unnecessary. Although Complainant's counsel argues that because of his expertise he should command a high hourly rate, he nevertheless appears for the four day hearing with co-counsel. Despite having co-counsel at the hearing, co-counsel did not question any witnesses or give either the opening or closing argument. Additional concern pertains to billings in May of 2007 that commingle travel time with a large amount of time spent with witnesses; however, travel time should be billed at 50 per cent of the attorneys' normal billing rate. This was not taken into account. Time spent on discovery appears excessive. In addition, the Agency provided

accurate examples of billings for emails based upon a minimum of fifteen minute time periods, irrespective of the length or content of the emails.

When a fee reduction is in order based on excessive hours, such as this case, the Commission may reduce the hours by an across-the-board reduction rather than by a precise hour reduction. Bunch v. Department of Agriculture, EEOC Appeal No. 07A30055 (January 30, 2004); Bernard v. Department of Veterans Affairs, EEOC Appeal No. 01966861 (July 17, 1998). I decline to engage in a line by line analysis of the requests, but instead make the general observation that the hours billed merit a reduction.

Based upon both parties' submissions and the evidence presented I find that an across-the-board reduction of ten per cent is appropriate. Therefore, the Complainant is awarded the sum of $114,842.48 for attorney fees.

### Costs

The Complainant claimed $9,832.30 for costs associated with travel and other items (hotel, meals, rental car, parking, tolls, transcripts, courier services, long distance telephone calls, photocopying, postage, facsimile transmissions, etc.). Courts have long recognized that reasonable out-of-pocket expenses incurred by an attorney which are normally charged to fee-paying clients are reimbursable. Commission precedent requires that a petition seeking reimbursement of costs be supported by detailed documentation, including receipts. Drummond-Irving v. Depart. Of Homeland Security, EEOC Appeal No. 0720060051 (May 17, 2007); citing to; Canady v. Depart. of the Army, EEOC Request

60

No. 05890226 (December 27, 1989). In Hendley v. Depart. of Justice, EEOC Appeal No. 01A43034 (March 30, 2005), the Commission, on appeal of an Agency's Final Agency Decision, held that the Complainant was not entitled to costs because the record was void of receipts or bills documenting such costs even though the Complainant's attorney provided an Affidavit detailing the specific costs incurred.

In the case at bar, the Complainant's attorney submitted his office log noting such expenses, but he did not attach any receipts or bills from vendors. Based upon Commission precedent, the Complainant has not proved her claimed costs because of her failure to provide adequate documentation. Therefore, Complainant is not awarded any costs.

## Summary of Monetary Awards

1.  I find that the Complainant is entitled to non-pecuniary compensatory damages in the amount of $60,000.

2.  I find that the Complainant is not entitled to costs due to insufficient information and documentation.

3.  I find that the Complainant is entitled to $114,842.48 for attorney fees.

4.  I find that the Complainant is entitled to back pay which shall be calculated based upon the formulas set forth in the Back Pay section of this Decision. See pages 51-53 of this Decision.

## Non-Monetary Corrective Action

I hereby award the following relief:

1.   The Agency shall post at all of FEMA's EEO and personnel offices throughout the country[24], immediately upon receipt of this Decision and in conspicuous locations (such as, an employee bulletin board and all places where notices to employees and applicants for employment are customarily posted), copies of the attached Notice after being signed by the current Mitigation Region Director for Region 4.  The Notice shall remain posted and be maintained by the Agency for one hundred and twenty days (120) consecutive days.  The Agency shall take reasonable steps to assure that the Notice is not altered, defaced or covered by any other material.  The Notice to be posted shall read as follows:

## NOTICE

A.   This Notice is being posted as part of the remedy in a Decision by the Equal Employment Opportunity Commission which found that unlawful race and gender discrimination and retaliation occurred at the Long Term Recovery Office in Orlando, Florida.

B.   Federal law requires that there be no discrimination against any employee because of the employee's race or sex, or because of the employee's participation in protected EEO activity.  Federal law requires that there be no discrimination or retaliation with respect to the terms, conditions, and privileges of employment.

---

24  It is necessary to have a nationwide distribution given the Agency's public announcements to managers and staff that the Complainant was the subject of an administrative investigation and released.  This is also important because  some DAEs have worked in various locations in the country, including but not limited to, Orlando, Florida.

62

C.   The Department of Homeland Security (Federal Emergency Management Agency) will support and will comply with such federal laws in all respects and will not take any action against employees because they exercise their rights under the law.

D.   The Department of Homeland Security (Federal Emergency Management Agency) has taken or will take the remedial action ordered in the Decision.

> [INSERT SIGNATURE OF
> CURRENT MITIGATION
> DIRECTOR FOR REGION 4]

* * *

2. The Agency shall require Janet Lamb, Wayne Box, Kathy Johnston, and Cindy Bourgeois to attend training on the requirements of Title VII on an annual basis for the next two years. Said training shall be provided by an attorney that has at least five years of experience working with Title VII cases. The first EEO training session shall be at least eight hours in length (of which four hours shall be devoted to harassment issues and at least two hours spent on retaliation issues, with a portion of this time spent on responsibilities of supervisors when they observe racially derogatory language being used in the workplace) and occur within six months of this Decision. The second training session shall take place within twelve months of the first session, but no sooner than nine months after the first training session, and shall be at least four hours in length.

It is also highly suggested that the Agency provide basic EEO training to its DAEs with special emphasis on what

63

to do when an employee hears derogatory language used in the workplace against any "protective category" under Title VII.

3. Janet Lamb, Wayne Box, Kathy Johnston, and Cindy Bourgeois shall attend training in racial sensitivity over the next two years. The first training session shall be at least a two day course and occur within six months. The second training session shall take place within twelve months of the first session, but no sooner than nine months after the first training session, and shall be at least one day.

4. Within two weeks from the date of this Decision the Agency shall expunge from Complainant's personnel file or any other file (other than the Agency's legal files) any and all documents which reference, incorporate or refer to the administrative investigation of the Complainant, her release, or her subsequent requirements to take a course and complete a mentoring assignment. The administrative investigatory file shall also be expunged, except from the Agency's legal files.

5. The Agency shall not require the Complainant to complete a mentoring assignment.

6. The Agency shall change the Complainant's evaluation contained within the ROI as Ex. F2, p. 75 to reflect a "s+" as her rating on supervisor elements 1, 4, 5, 6, and 7, and a "s+" on supervisor elements 2 and 3[25]. The following words shall be redacted: "Sylvia was released from this disaster pending the outcome of an administrative investigation. Supervisor rating not evaluated. At this time rating is pending outcome as stated above. I don't feel I have the authority to provide these job rating. 5/27." The

---

[25] These new ratings will be, as close as possible, reflective of the comments written on her nomination for an award on January 6, 2005, just before the discrimination began. Agency Ex. 2.

Complainant's handwriting shall also be redacted where she wrote "Signed in receipt only, pending review and advise of counsel." The above corrections shall be made two weeks from the date of this Decision and a new evaluation provided to the Complainant for signature. (The original May 27, 2005 dates shall remain on the evaluation). Once the Complainant signs this evaluation and returns it to the Agency's Representative it shall become her official performance appraisal for May 2005 and placed in her personnel file. The uncorrected version shall be expunged, except for a copy for the Agency's legal files.

In the event that the redactions are obvious and it makes the document appear altered, then a brand new document shall be created to reflect the above.

7. The Agency shall issue the following the email within two weeks of the date of this Decision to all of its employees nationwide[26] and said email shall be sent from the Mitigation Region Director for Region 4:

> We are fortunate to announce to you that Sylvia Farrington, one of our past and highly respective managers, has agreed to return to work for FEMA. She has consistently proven herself in performing both management and programmatic responsibilities in an outstanding manner. She has worked both in the field and at headquarters so she brings a wealth of experience with her. Many of the processes she has developed in the past have been extensively utilized and a training course she developed

---

26  See footnote 24. It should be noted that the vast majority of the language for this email was taken from the Complainant's nomination for an award, dated January 6, 2005.  Agency Ex. 2.  The Agency shall provide a copy of the email (and verification of its dissemination) to the Complainant within one week of its distribution.

> was of such high caliber it was used throughout
> the country. Her leadership skills and
> management style supports teamwork and we are
> fortunate to have her return. Welcome Back
> Sylvia!

8.   The Agency has represented that there is a position for
the Complainant. Therefore, in lieu of front pay the Agency
shall immediately place the Complainant in a comparable
managerial position to the Complainant's Branch Chief position
that she held in Orlando, Florida, in 2005. This comparable
managerial position shall be in Cadre 4 (or other type of
position located in Cadre 4 or elsewhere if the Complainant
voluntarily agrees). The Agency must ensure that the position
is not under the supervisory authority (direct or indirect) of
Janet Lamb and/or Wayne Box. Thus, when appointing the
Complainant to a position in Cadre 4 it must do so while
meeting the above requirements. If the circumstances require
that Janet Lamb and/or Wayne Box be transferred to a different
Cadre in order to meet the requirements set forth above, then
the Agency is required to enact such a transfer.

   IT IS SO ORDERED.

## NOTICE

   EEOC regulations require the Agency to take final action
on the complaint by issuing a final order within forty
calendar days of receipt of the hearing file and this
decision.   The Agency's final order shall notify the
Complainant whether or not the Agency will fully implement

*3 days*

defendant in any such lawsuit and the applicable time limits for such appeal or lawsuit. The Complainant may appeal to the Commission within thirty calendar days of receipt of the Agency's final order concerning its implementation of this decision. If the final order does not fully implement this decision, the Agency must also simultaneously file an appeal to the Commission in accordance with 29 C.F.R. Section 1614.403, and append a copy of the appeal to the final order. A copy of EEOC Form 573 must be attached to the final order.

**The Complainant may not appeal to the Commission directly from this decision unless the Agency has not issued its final order within forty calendar days of its receipt of the hearing file and this decision.** If the Complainant is filing a direct appeal under these circumstances, a copy of the Administrative Judge's decision should be attached to the appeal. The Complainant should furnish a copy of the appeal to the opposing party at the same time it is filed with the Commission, and should certify to the Commission the date and method by which such service was made on the opposing party.

All appeals to the Commission must be filed by mail, personal delivery or facsimile to the following address:

> Director
> Office of Federal Operations
> Equal Employment Opportunity Commission
> P.O. Box 19848, Washington, D.C. 20036
> Fax No. (202)663-7022

Facsimile transmissions over ten pages will not be accepted.

## COMPLIANCE WITH AN AGENCY FINAL ACTION

An Agency's final action that has not been the subject of an appeal to the Commission or civil action is binding on the Agency. See 29 C.F.R. §1614.504. If the Complainant

believes that the Agency has failed to comply with the
terms of a final action, the Complainant shall notify the
Agency's  EEO  Director,  in  writing,  of  the  alleged
noncompliance  within  thirty  calendar  days  of  when  the
Complainant  knew  or  should  have  known  of  the  alleged
noncompliance.    The  Agency  shall  resolve  the  matter  and
respond  to  the  Complainant  in  writing  within  thirty  days.
If  the  Complainant  is  not  satisfied  with  the  Agency's
attempt  to  resolve  the  matter,  the  Complainant  may  appeal
to  the  Commission  for  a  determination  of  whether  the  Agency
has  complied  with  the  terms  of  its  final  action.    The
Complainant  may  file  such  an  appeal  within  thirty  calendar
days  of  receipt  of  the  Agency's  determination  or,  in  the
event  that  the  Agency  fails  to  respond,  at  least  thirty-
five  calendar  days  after  Complainant  has  served  the  Agency
with  notice  of  the  alleged  noncompliance.  A  copy  of  the
appeal  must  be  served  on  the  Agency.    The  Agency  may  submit
a  response  to  the  Commission  within  thirty  calendar  days  of
receiving  the  Complainant's  notice  of  appeal.


Eve G. Friedli                          Date: September 26, 2008
Administrative Judge

# Farrington Billing Summary
Prepared 08/07/07
May 2005 through July 2007

| MONTH | ATTY. FEES | EXPENSES | TOTAL HOURS |
|---|---|---|---|
| May 2005 | 450.00 | - | 2 |
| June 2005 | 912.50 | 4.37 | 4.5 |
| July 2005 | 562.50 | 6.50 | 2.5 |
| August 2005 | 788.75 | - | 3.95 |
| September 2005 | 393.75 | - | 1.75 |
| October 2005 | 1,081.25 | 1.30 | 5.25 |
| November 2005 | 743.75 | 17.34 | 3.75 |
| December 2005 | 675.00 | 6.94 | 3 |
| January 2006 | 1,068.75 | 4.99 | 4.75 |
| February 2006 | 5,056.25 | 1,453.83 | 27.5 |
| March 2006 | 1,687.50 | 597.06 | 7.5 |
| April 2006 | 1,285.00 | - | 5.25 |
| May 2006 | 1,235.00 | - | 5.25 |
| June 2006 | 585.00 | - | 2.25 |
| July 2006 | 715.00 | 0.39 | 2.75 |
| August 2006 | 1,170.00 | 3.19 | 4.5 |
| September 2006 | 3,549.00 | 9.14 | 14 |
| October 2006 | 8,223.00 | 65.60 | 35.25 |
| November 2006 | 13,131.00 | 213.55 | 58.25 |
| December 2006 | 15,799.80 | 1,396.27 | 81.1 |
| January 2007 | 11,908.00 | 327.87 | 52.5 |
| February 2007 | 10,358.00 | 3.08 | 48.75 |
| March 2007 | 4,290.00 | 0.88 | 17.75 |
| April 2007 | 9,297.00 | 799.59 | 42 |
| May 2007 | 53,492.00 | 4,767.95 | 259 |
| June 2007 | 2,046.40 | 92.36 | 8.8 |
| July 2007 | 16,850.00 | 60.10 | 84.5 |

| | TOTAL: | 167,354.20 | 9,832.30 | 788.35 |
|---|---|---|---|---|
| | TOTAL OF ATTORNEY'S FEES AND EXPENSES: | | | 177,186.50 |

AJ Exhibit 1



EXHIBIT

A